**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LASHAWNA LANE-MURRAY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-08474 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JIMMY PAYTON and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In July 2016, Lashawna Lane-Murray lost her husband, Sydni Murray, in a car accident. Murray was riding in the passenger seat of a car driven by his friend, Jimmy Payton, when Payton ran a red light at an intersection. At that moment, Jason Kulesza, driving a United States Postal Service truck, was crossing through the intersection on a green light and ended up striking the passenger side of Payton's car, where Murray was sitting. Murray was killed on impact.

Eventually, Lane-Murray filed this wrongful-death lawsuit against both the United States government (under the Federal Tort Claims Act) and Payton.[1] R. 1, Compl.[2] According to Lane-Murray, Payton and Kulesza were both responsible for the accident—Payton because he was intoxicated, and Kulesza because he was speeding. The defendants in turn dispute the apportionment of liability between

---

[1]This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1346(b) and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

[2]Citations to the record are "R." followed by the docket entry number and, where applicable, a page or paragraph number.

them—the government argues that Payton was 100% responsible, while Payton argues that the government should also be held at least 50% liable (and thus also on the hook for damages).

In March 2020, the case proceeded to a three-day bench trial, during which both fact and expert witnesses testified. Before trial, the parties each filed briefs outlining proposed governing legal principles. R. 126, Pl.'s Br.; R. 115, Payton Br.; R. 116, Gov't Br. This Opinion sets forth the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. These findings are based on the exhibits allowed into evidence and the testimony provided at trial. The findings are also premised on the Court's credibility determinations after observing each of the witnesses testify in person at trial.

As detailed below, on review of the evidence, the Court finds that Payton and Kulesza were both negligent, though at vastly different apportionments. Specifically, Payton was 95% at fault, while Kulesza was 5% at fault. The Court also finds that Murray's estate is entitled to the following wrongful-death damages: $1,750,000 in compensatory damages for Murray's wife and three children and $11,760 in funeral expenses, with Payton and the government responsible for their respective percentages.

## I. Factual Background

## A. Undisputed Evidence

The following evidence was offered at trial and is undisputed except where noted.[3] The accident happened on July 16, 2016 at roughly 3:16 a.m. It took place at the intersection of West Congress Parkway and South Independence Boulevard on the west side of Chicago. R. 80, Proposed Pretrial Order at 2 (Stipulations 1 and 2).[4] For reference, Independence is a north-south street, while Congress is an east-west street. The collision happened when Payton and Murray were driving northbound on Independence Boulevard (Stipulation 3), while Kulesza was driving westbound on Congress Parkway (Stipulation 4). Here is an aerial view of the area:



---

[3]To the extent that any factual findings are made in the Conclusions of Law section, that was done to better organize the Opinion for comprehensibility.
[4]The parties stipulated to certain facts before trial. *See* R. 80, Proposed Pretrial Order at 2-3. For convenience's sake, the rest of this Opinion will simply cite to stipulated facts as "Stipulation" followed by the stipulation number.

Gov't Exh. 31 at 6.[5] Although the streets are not labeled in the image, the yellow "Path of Jeep" arrow reflects Payton and Murray's northbound route along Independence, while the yellow "Path of USPS Truck" arrow reflects Kulesza's westbound route along Congress (coming off the exit ramp of the I-290 expressway).

On the night of the accident, Payton and Murray had been socializing with their friends. Payton testified that he began drinking alcohol at around 7 p.m. He also started using marijuana around the same time. According to Payton, he continued to use marijuana until about 2 a.m. (It is not clear what time he stopped drinking.) At some point after that, Payton and Murray got into Payton's car together and drove to Payton's father's house; Payton was the driver. They spent a short time at Payton's father house, and then Payton and Murray got back into the car to head to Payton's home.

It was en route from Payton's father's house to Payton's home that the accident happened. Specifically, at some point shortly before 3:16 a.m., Payton and Murray turned northbound onto Independence Boulevard. They were in the rightmost traffic lane, which was a through-lane, as they headed straight through the intersection, not knowing that the life-changing moment was about to strike.

Meanwhile, as tragic luck would have it, Kulesza had just exited the I-290 expressway, driving up a ramp that merges onto westbound Congress Parkway (Stipulation 4). At the time, Kulesza was acting within the scope of his employment

---

[5]The yellow arrows and red labels were created by the government's expert, Michael Bracki. This photo was taken from Bracki's demonstrative exhibit, which was designated as Government Exhibit 31.

as a truck driver for the United States Postal Service (Stipulation 5). Kulesza's job was to transport mail in a box truck from the main post office in downtown Chicago to a post office branch on the West Side. According to Kulesza, he had worked for the Postal Service for nearly 20 years, and he had driven that exact route almost daily for around three years. Kulesza testified that, over the years, he had witnessed at least two car accidents at that very intersection of Independence and Congress, and he had heard of many more accidents. He also knew that the intersection was obstructed by dense foliage, so it was difficult to see cars approaching the intersection from northbound Independence while on westbound Congress. (The point about foliage obstruction was also observed by the government's expert, Michael Bracki.) On the night of the accident, Kulesza's mail truck was fully loaded and weighed around seven tons. Kulesza, for his part, was either in the leftmost lane or the center lane on Congress; the parties dispute this fact. In any event, he also planned to drive straight through the intersection to continue on westbound Congress.

This brings us to the few seconds before the crash. As mentioned above, Payton and Murray were driving northbound on Independence Boulevard, approaching Congress Parkway. Kulesza was driving westbound on Congress Parkway, approaching Independence Boulevard. Kulesza testified that as he crossed into the intersection, his light (that is, the traffic light governing westbound Congress) was green. Payton, however, testified that as he approached the intersection, he saw that *his* light (that is, the traffic light governing northbound Independence) was green. In

5

other words, in the second or so leading up to the crash, both Payton and Kulesza maintain that they had the green light.

Unfortunately, there is no video footage directly showing the traffic light sequences at the exact moment of the crash, because there were no video cameras aimed directly at the traffic lights themselves. But there is video footage, taken from a police observation device (commonly known as a "POD" camera), showing the two vehicles entering the intersection and colliding. Specifically, there was a POD camera (which is indicated in the satellite image above with a red arrow and the label "POD #6208") attached to a light pole located on the northwest corner of Independence and Congress. This POD camera directly captured the collision.

The POD video was played during trial and showed the following sequence of events. *See* Gov't Exh. 23. At 3:15:58 (that is, 3:15 a.m. and 58 seconds), two cars approach the intersection—one on westbound Congress and the other on northbound Independence. The car on Independence does not stop and drives straight through the intersection; the car on Congress stops at the intersection. At 3:16:15, another car drives through the intersection without stopping on northbound Independence. At 3:16:30, the car that had been stopped on westbound Congress begins to move and drives through the intersection. After that, three or four more cars also drive through the intersection on westbound Congress. At 3:16:40, the Postal Service box truck driven by Kulesza enters the frame on westbound Congress. At 3:16:41, Kulesza continues to drive on westbound Congress toward the intersection with no sign of slowing down. At 3:16:42, Kulesza's truck enters the intersection. This is also the

precise moment when Payton's car enters the frame on northbound Independence and drives straight through the intersection. Kulesza's truck crashes into the passenger side of Payton's car. By 3:16:44, the force of the crash has sent both vehicles out of the frame. Murray died on impact (Stipulation 6). Payton and Kulesza both survived and were taken to a hospital for treatment.

An undisputed speed analysis would later reveal that Payton had been driving 53 miles per hour, while Kulesza had been driving 36 miles per hour. Gov't Exh. 31 at 10. (This was a demonstrative exhibit, but the Court cites it for convenience's sake as the stand-in to the testimony). It is also undisputed that both Payton and Kulesza were going above their respective speed limits; however, and as discussed in more detail below, there is an intense dispute over what speed limit governed Kulesza's travel route.

At around 4 a.m., Chicago Police Officer Charles Galey showed up at the scene. Galey was a member of the Chicago Police Department's Major Accidents Investigation Unit and had been assigned to investigate the crash. Later that morning, at around 9 a.m., Galey went to the hospital to speak with Payton and Kulesza. At the hospital, Galey learned that Payton had been intoxicated at the time of the accident. Specifically, Payton had marijuana in his system, and his blood alcohol level was found to be 0.16 (which was twice the legal limit of 0.08).

As a result of the accident, Payton was charged with various crimes. Gov't Exh. 47 at 1. In September 2017, he pled guilty to two counts of aggravated driving under the influence and one count of reckless homicide. Gov't Exh. 46 at 5-8. Payton is

currently serving a five-year sentence in the custody of the Illinois Department of Corrections. Gov't Exh. 48. Kulesza, for his part, was initially issued a red-light citation (Stipulation 12), but it was later dismissed (Stipulations 13 and 14).

At the time of his death, Murray was 31 years old (Stipulation 10) with 44 more years of life expectancy (Stipulation 11). Murray is survived by his wife, LaShawna, and his three children, K.M., A.M., and S.M.[6] (Stipulation 8).

### B. Factual Findings

As alluded to earlier, the parties dispute several important facts about the accident. It is time to resolve those disputes.

### 1. Payton's Intoxication

As a threshold matter, the Court finds that Payton was intoxicated at the time of the accident. Indeed, despite his lawyer's suggestions to the contrary, Payton himself testified that he was intoxicated, and Officer Galey also testified that shortly after the accident, Payton had marijuana in his system and his blood alcohol level was twice the legal limit. Even if Payton had disputed this fact, though, issue preclusion means he would have been bound by his guilty plea and conviction for two counts of aggravated driving under the influence.[7] During the plea colloquy, Payton

---

[6]The Federal Rules of Civil Procedure require that minors be referred to only by their initials. Fed. R. Civ. P. 5.2(a)(3).

[7]As the Court explained in its pretrial decision on motions in limine, R. 108, issue preclusion is applicable if: (1) the issue that was decided in a prior case is identical to the one present in the current action; (2) final judgment on the issue was reached in the prior case; and (3) the party against whom the preclusion is now aimed was a party in the prior case. *Sanchez v. City of Chicago*, 880 F.3d 349, 357 (7th Cir. 2018) (citing *Du Page Forklift Serv., Inc. v. Material Handling Servs., Inc.*, 744 N.E.2d 845, 849 (Ill. 2001)). Beyond these threshold requirements, courts must also determine that "no unfairness will result to the party sought to be estopped," which means the party must have had "a full and fair

specifically admitted to driving "while the alcohol concentration in his blood or breath was .08 or more." Gov't Exh. 46 at 5.

## 2. Payton's Control of Car

Payton attempts to mitigate his intoxication status, however, by arguing that even though he was intoxicated, he was still in full control of his car and had full coordination of his sight and hearing. But the Court is not persuaded by Payton's testimony on this point. Specifically, the fact that he did have a substantial amount of alcohol in his system makes it much less likely that he really had full control over his motor abilities. Moreover, it is undisputed that he was going 53 m.p.h. (in a 30 m.p.h. zone) when he drove into the intersection and collided with Kulesza. As the POD video footage makes clear, Gov't Exh. 23 at 3:16:32-3:16:44, that is way too fast for that urban intersection, especially compared to how fast the other cars on the road were going that night. It is true that, at least based on the few seconds of footage available, Payton was not visibly swerving or going out of his lane, but given his intoxication status and the fact that he was speeding, the Court refuses to find that Payton was in full control of his car at the time of the accident.

## 3. Traffic Lights

Moving on, the next dispute is more intense: who ran the red light, Payton or Kulesza? The answer is clear. Payton is again bound by the factual admissions in his guilty plea. Specifically, as mentioned above, Payton pled guilty to reckless homicide

---

opportunity to present his case" and an "incentive to litigate." *Am. Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (2000). Here, the Court determined that all of the criteria for issue preclusion had been satisfied. R. 108 at 7-10.

and aggravated driving under the influence. *See* Gov't Exh. 46 at 5-8. During the plea colloquy, the fact that Payton drove through the red light was offered by the government and accepted by the court as a basis for the plea. *Id.* at 11-12, 14. Thus, even though Payton testified at trial that his light was green, the Court cannot credit that testimony in light of the plea. And even if there was enough wiggle room in applying issue preclusion against Payton so that he is somehow not *legally* bound by that admission, as a *factual* matter the Court would find that the admission was powerful evidence against Payton and that he ran the red light.

But that still leaves Lane-Murray, who of course was not a party to Payton's criminal case, nor aligned with Payton. So Lane-Murray is *not* bound by issue preclusion and is free to argue that Payton had the green light and Kulesza ran the red light.[8] Indeed, at trial, Lane-Murray argued that Kulesza ran the red light, while the government maintained that Payton ran the red light.

Turning first to the government's argument that Payton ran the red light, the government offered the following evidence at trial. First, there was Payton's plea-colloquy statement itself, which, although not binding on Lane-Murray, could still be

---

[8]The Court acknowledges that this asymmetrical application of issue preclusion could potentially lead to some strange results at trial if Payton were bound by the factual admission that he ran the red light, but Lane-Murray was able to prove by a preponderance of the evidence that it was actually Kulesza who ran the red light. If that had happened, then the Court would likely find a larger share of liability for the government for purposes of Lane-Murray's claims; but then the government would be entitled to try to offset some of those damages through a contribution claim against Payton, in which case they could rely on the fact that Payton, not Kulesza, ran the red light. *See* R. 27, Answer at 2 ("Jimmy Payton's negligence contributed in whole or in part to the damages Lane-Murray alleges, and the Illinois law on contribution, 740 ILCS 100/2, applies to eliminate or reduce any recovery against the United States.").

introduced as persuasive evidence. *See* Gov't Exhs. 46, 57, 48. The statement is not hearsay because it is a prior inconsistent statement under oath and Payton was available at his deposition (which stood-in for his trial testimony) for cross-examination. Fed. R. Evid. 801(d)(1)(A). Then, there was Kulesza's testimony that his light was green. Specifically, Kulesza explained that when he exited the I-290 expressway (that is, when he drove onto the exit ramp leading onto Congress Parkway), he began pressing the brake pedal on his truck to slow down. While on the exit ramp, Kulesza noticed that the traffic light governing westbound Congress was red. So, he continued braking as he got off the exit ramp and merged onto westbound Congress Parkway. But at some point when Kulesza was on the short stretch of road between the end of the exit ramp and the intersection, he saw that his light turned from red to green. So, as he approached the intersection, he took his foot off the brake pedal and switched to the gas pedal so that he could drive through the intersection on the green light. That testimony was credible.

On top of that evidence, the government also offered light timing analyses by Officer Galey, the accident investigator, and Michael Bracki, the government's accident reconstruction expert. As mentioned above, there is unfortunately no direct video footage or photographs of the traffic lights at the time of the accident. But both Galey and Bracki testified about various pieces of circumstantial evidence suggesting that Kulesza's light was green and Payton's light was red.

Specifically, Officer Galey testified that, in his capacity as an accident investigator for the police department, he believed Kulesza had the green light and

11

Payton had the red light at the time of the collision. In support of that conclusion, Galey pointed to three pieces of evidence: (1) his light-timing analysis; (2) the activity of the other cars on the road; and (3) the reflection of a green light in the windshield of Kulesza's USPS truck. With regard to the light-timing analysis, Galey explained that, on the day *after* the crash, he returned to the accident site at roughly 3:16 a.m. (the same time as the accident) to observe the traffic lights. Basically, Galey drove down westbound Congress until he reached the Independence intersection, and then he waited in his car and recorded the length of the green, yellow, and red lights governing westbound Congress (that is, Kulesza's light). According to Galey's calculations, the red light lasted 41.1 seconds, the green lasted 20.8 seconds, and the yellow lasted 2.9 seconds. *See* Gov't. Exh. 56.

Galey then checked his light-timing analysis against the POD video footage, in which he could see when other cars were either stopping or driving through the intersection. Specifically, when cars were driving through the intersection, Galey inferred that the light was green, and when cars were stopped at the intersection, Galey inferred that the light was red. According to Galey, based on the timing of when the cars on westbound Congress were either stopped at the intersection or drove through the intersection, he could infer when the westbound Congress light was either red or green. And during the collision, he inferred that the light for westbound Congress (Kulesza's light) was green based on when the cars on Congress started proceeding through the intersection.

The final piece of evidence Galey offered was the reflection of a green light in the front windshield of Kulesza's Postal Service truck during the collision. *See* Gov't Exh. 23 at 3:16:43. Here is a screenshot from the POD video:



Gov't Exh. 31 at 22. Remember that this POD camera was located on a light pole on the northwest corner of the Congress and Independence intersection. According to Galey, the reflection in this screenshot demonstrates that the westbound Congress light was green at the moment that the crash occurred.

Officer Galey's conclusions were echoed by the government's accident reconstruction expert, Michael Bracki. In fact, Bracki went even farther in his light-timing analysis by comparing the northbound Independence light sequences to the southbound Independence lights. To do this, he requested official light timing data from the City of Chicago Department of Transportation and also studied bystander videos of the accident. According to Bracki, the official City of Chicago data showed that the southbound Independence light and the northbound Independence light were physically wired such that they always change simultaneously. So, when the northbound Independence light changes from red to green, the southbound

Independence light also changes from red to green. In addition, Bracki explained that the City of Chicago data showed that the northbound and southbound Independence light sequences ran on the same fixed 65-second loop. So, no matter what time of day it was, the length of the lights remained constant throughout the day. Here is a diagram of the lights at both northbound and southbound Independence:



Gov't Exh. 31 at 27.[9] As the image shows, northbound Independence and southbound Independence are actually separate streets entirely. Both of them are intersected by westbound Congress, which means there is a little stretch of westbound Congress between northbound and southbound Independence.

It was important to look at both streets, Bracki explained, because one of the bystander videos of the accident actually captured the traffic lights for southbound

_____

[9]The red and green arrows were created by the government's expert, Michael Bracki, and are meant to reflect the position of the traffic lights at the various streets of the intersection. The Court added black and white labels to indicate the relevant street names.

Independence shortly after the accident. Specifically, bystander footage showed Kulesza's USPS truck rolling to a stop in front of the southbound Independence traffic lights; roughly 17 seconds after the crash, the southbound Independence lights changed from red to green. Thus, with the knowledge that the southbound and northbound lights change at the same time, it was possible for Bracki to make inferences about the northbound lights as well, despite not having direct footage of them. In other words, Bracki could conclude that the northbound Independence lights also changed from red to green roughly 17 seconds after the crash. (As for the timing of these events, Bracki explained how he used common anchor points to match the bystander footage with the official POD video and thus determine when certain events happened in the bystander video.) Bracki could then work backwards from that to determine, based on the light-timing sequences, whether the northbound Independence light was red or green at the time of the accident.

Like Galey, Bracki also observed the behavior of the other cars on the road (noting when they were stopping and going), as well as reflection evidence. For instance, Bracki explained how 27 seconds before the accident, a car drove through the intersection on northbound Independence, and a red light was reflected on that car's *side* windows, which suggested that the light for northbound Independence was green, while the light for westbound Congress (which was reflected in the window) was red. The same thing happened roughly four seconds before the accident, when a car drove through the intersection on westbound Congress, and a red light was reflected in the side windows, which suggested that the light for westbound Congress

was green, while the light for northbound Independence was red. Bracki also pointed to the reflection of the green light in the front windshield of the Postal Service truck at the moment of the accident itself, which, according to Bracki, suggested that the westbound Congress light was green at that time.

One more complication that Bracki highlighted was the fact that the westbound Congress lights were actually staggered in order to accommodate the clearing of cars from the little stretch of road between northbound and southbound Independence, as shown in the image above. Bracki explained that, based on the programming of the lights, the sequence ran as follows: the westbound Congress lights located at the northbound Independence intersection would turn from green, to yellow, to red, but the westbound Congress lights located at the *southbound* Independence intersection would remain green. So, it would look something like this:



Gov't Exh. 31 at 24.[10] The purpose of that differential timing was to allow cars stuck in that in-between piece of road on westbound Congress to clear the intersection. After a few seconds, the westbound Congress lights located at the southbound Independence intersection would also turn from green, to yellow, to red. At that point, both sets of westbound Congress lights were red, and only then would both of the northbound and southbound Independence lights—which would have been red the entire time—simultaneously change from red to green.

Thus, Bracki explained how the bystander footage showing the southbound Independence light changing from red to green at 17 seconds after the crash could not only be used to infer what was happening with the northbound Independence lights, but could also shed light on what was going on with both sets of westbound Congress lights. Working backward from the staggered timing of the westbound Congress lights, Bracki concluded that at the time of the accident, the light for Kulesza (that is, the first set of lights on westbound Congress) was green.

To resist this conclusion, Lane-Murray elicited two main pieces of evidence in support of the argument that Kulesza, not Payton, ran the red light. First, there was Payton's own testimony that his light was green. Indeed, Officer Galey also testified that when he interviewed Payton a few hours after the accident, Payton told him that the light on Independence was actually red and he had waited at the intersection until his light turned green, which is when the accident happened. Second, Lane-Murray offered a different interpretation of the reflection evidence discussed above.

---

[10]Once again, the red, green, and yellow arrows were created by the government's expert, Michael Bracki, while the black and white street labels were created by the Court.

Specifically, Lane-Murray points out that the image of the windshield reflection was captured right when the force of the collision caused the Postal Service truck (which had been facing west right before the accident) to veer to face northwest. Because the Postal Service truck was facing northwest in the image, that purportedly suggests that the green light reflected in the truck's front windshield had to be the traffic light for northbound Independence, not westbound Congress. Thus, the implication offered by Lane-Murray was that Payton had the green light at the time of the collision, and Kulesza ran the red light.

To sum up, then, the following evidence supports Kulesza having the green light: Payton's guilty plea and conviction, Kulesza's testimony, the light-sequence timing analyses performed by Galey and Bracki, and the windshield reflection evidence. On the other side, the evidence supporting Payton having the green light comprises only Payton's testimony and the alternative interpretation of the windshield reflection evidence. Given this evidence, the Court finds that Lane-Murray has not proven, by a preponderance of the evidence, that Payton had the green light and Kulesza ran a red.

For one, the Court did not find Payton's testimony about his green light to be credible. Given that he was intoxicated at the time of the accident, it is entirely possible that he either did not see the light or at least misremembered what he did see. Or, worse, that he outright lied. After all, only a few hours after the accident, Payton told Officer Galey that not only did he have the green light, but that he had waited at a red light and watched the light turn from red to green before entering the

18

intersection. That sequence of events is clearly contradicted by the POD video footage, which shows him driving straight into the intersection without stopping at the light *at all*. Payton's credibility is severely undermined by the video's indisputable refutation of his assertion that he had stopped at the intersection

On the windshield-reflection evidence, that footage is at best inconclusive, which is not enough to meet the preponderance of evidence standard. The Court agrees with Lane-Murray that the windshield evidence does not definitively prove that the westbound Congress light was green. As Lane-Murray points out, at the moment the light reflection becomes visible in the video footage, the Postal Service truck is actually in the midst of veering north. Indeed, the fact that the POD camera itself is located at the *northwest* corner of the intersection suggests that at the moment the image was captured, the Postal Service truck was at least facing northwest, because the northwest-facing camera was able to capture the front of the truck head-on. Depending on the concavity of the windshield (which we know nothing about), the green light possibly could be (if there were no other evidence) the westbound Congress light, although it is unlikely and hard to tell for sure. Thus, the reflection evidence is *at best* inconclusive.

In contrast, the Court was persuaded by the light-timing analyses conducted by Galey and Bracki. The Court agrees that the stop-and-go behavior of the other cars on the road suggests at least that the westbound Congress light turned green around 13 seconds before the collision (that is, roughly 13 seconds before 3:16:30), and based on the light-timing analysis by Galey, that green light should have lasted at least 20

seconds. That timing is confirmed by Bracki's analysis, in which he concluded that Kulesza's light likely turned to yellow about 5 seconds after the accident, and then red about 8 seconds after the accident. And then 17 seconds after the accident, the bystander-video footage clearly shows the southbound Independence lights turning from red to green, which means the northbound Independence lights also turned from red to green. *See* Gov't Exh. 31 at 29. If Payton truly had the green light at the time of the accident, that would mean that in the 17-second span between the collision and the light changing in the bystander video, the northbound Independence light would have had to at least cycle through a green, yellow, and red light, then back to green, which does not match up with the timing analyses developed by Galey and Bracki. And Lane-Murray does not really offer any evidence undermining the methodology or conclusions of the light-timing studies.

All in all, in weighing the evidence and the live testimony, the Court finds that Kulesza had the green light, which means Payton ran the red light.

### 4. Kulesza's Traffic Lane

There was also a dispute about whether Kulesza was in the wrong traffic lane at the time of the accident. This is the backdrop: as westbound Congress meets the northbound Independence intersection, Congress has three lanes: a left-turn-only lane, a center through-lane, and a right-turn-only lane. Here is a close-up of the lanes:



Gov't Exh. 31 at 7.[11] This image also shows the short stretch of westbound Congress that lies *between* northbound and southbound Independence. That middle stretch of road itself has three lanes, including a left-turn-only lane and at least one straight-through lane. Backing up a bit, as the image shows, the lanes are aligned in such a way that the straight-through lane at northbound Independence feeds into the *rightmost* lane on the middle stretch of road. And the left-turn lane at northbound Independence (where Kulesza was) actually progresses, if a car drives straight without veering at all, into the *middle* straight-through lane. So, in order to make a left turn onto southbound Independence, a driver actually must switch lanes one more time to get into the left-turn lane on the middle stretch of road.

On the night of the accident, Kulesza was planning to drive straight past Independence and continue on westbound Congress. Thus, based on the lane markings, at the Congress and northbound Independence traffic light, he should have been in the center through-lane in order to end up in the rightmost lane on the middle stretch of road, where he could then continue straight on Congress. Indeed, Kulesza testified that he was in the center lane at the time of the collision. On cross-examination, however, Payton's counsel played the POD video footage and pointed out that in the video, the Postal Service truck was almost entirely in the left-turn-only lane while crossing the northbound Independence intersection. Here are a few screenshots from the video:

---

[11]Again, the yellow arrows and red labels were created by the government's expert, Michael Bracki.



Gov't Exh. 31 at 12. Based on the video footage, the Court agrees with Payton and finds that Kulesza was primarily in the left-turn-only lane on westbound Congress at the time of the accident. At most, he might have been veering *slightly*—just one foot or so—into the center lane, but the video footage clearly undermines Kulesza's testimony on this point.

According to the government, though, none of that matters because even if Kulesza was in the left-turn-only lane, that lane would have morphed into a straight-through lane by the time he reached the middle stretch of road between northbound and southbound Independence. It is true that the left-turn-only lane does become the straight-through lane on that middle stretch of road, so the lane configurations at first glance seem a bit odd. But there does appear to be method to the madness: the close-up image (displayed a couple of pages earlier in this Opinion) shows, on northbound Independence, a dashed lane marking that curves onto westbound Congress. The dashed line becomes the right-side of the middle straight-through lane

on Congress. So the middle lane on that in-between stretch of road accommodates drivers on northbound Independence who turn left onto Congress intending to go straight on Congress. Meanwhile, those on westbound Congress at northbound Independence should be in the straight-through lane if they wish to go, well, straight. Those drivers then proceed into what is the rightmost lane on the middle stretch. In contrast, a driver in the left-turn-only lane at Congress and northbound Independence should veer left into the left-turn-only lane at Congress and southbound Independence. That means that Kulesza was in the wrong traffic lane at the time of the collision.

### 5. Speed Limit

Finally, there is a dispute about the speed limit governing the stretch of westbound Congress Parkway that Kulesza was driving on right before the accident. This is ultimately a legal question but is premised on a few factual findings.

First, for the sake of completeness, there is no dispute that the speed limit on northbound Independence was 30 miles per hour. There is also no dispute that Payton, driving at 53 miles per hour, was going above that speed limit.

As for Kulesza, the parties dispute whether his speed limit on westbound Congress was 25 or 30 miles per hour. According to Lane-Murray and Payton, there was actually a 25-mile-per-hour speed limit marker posted on westbound Congress. During trial, Payton presented a photograph of the speed limit sign posted on westbound Congress between Independence to the west and Millard Avenue to the

east. *See* Payton Exh. 9. For context, on the satellite image below, Millard Avenue is indicated by the blue circle, while the speed limit sign is indicated by the blue star:



Gov't Exh. 31 at 6.[12] Payton also testified that he frequently drove on that stretch of westbound Congress between Millard and Independence and was personally familiar with the posted 25-mile-per-hour speed limit sign.

The government, however, argues that Kulesza did not see the speed limit sign. Indeed, Kulesza testified that when he got off the exit ramp and merged onto westbound Congress, he saw no speed limit signs at all between the end of the exit ramp and the Independence Boulevard intersection.

Both parties are factually correct. The Court finds that there was indeed a 25-mile-per-hour speed limit marker posted on westbound Congress between Millard Avenue and Independence Boulevard. The Court also finds that it was impossible for

---

[12]As mentioned above, the red and yellow labels were created by the government's expert, Michael Bracki. Here, the blue circle and blue star were both created by the Court in order to demonstrate the location of the speed limit marker.

Kulesza, coming off the I-290 exit ramp, to physically see the posted speed limit because the sign is located *before* the exit ramp, so drivers exiting off the I-290 expressway onto westbound Congress do not see any speed limit markers on westbound Congress between the I-290 ramp and the Independence intersection. Of course, that still leaves the question of whether Kulesza should be bound by a speed limit marker that was impossible for him to see, but, as mentioned above, that is ultimately a legal question, so it will be addressed in the next section.

## II. Conclusions of Law

Lane-Murray argues that Payton and Kulesza were both negligent under Illinois law. To be clear, the question of Payton's negligence is not seriously in dispute—he was intoxicated and ran a red light. Rather, the real crux of this case is whether (and to what extent) *Kulesza* was also negligent. As explained above, the Court finds that Kulesza had the green light as he entered the intersection, but he *was* driving over the speed limit when the accident occurred. The Court also notes that Kulesza was driving a seven-ton truck through an obstructed-view intersection.

In order to recover against the government for Kulesza's negligence, though, Lane-Murray must proceed under the Federal Tort Claims Act, 28 U.S.C. § 2674. The FTCA "is a limited waiver of the United States' sovereign immunity." *Luna v. United States*, 454 F.3d 631, 634 (7th Cir. 2006). It renders the federal government liable for those acts or omissions of its employees that would be unintentional torts in the state in which they happened had they been committed by someone other than a federal employee. *Id.*; *Richards v. United States*, 369 U.S. 1, 6 (1962); 28 U.S.C. §§ 1346(b)(1)

and 2674. An action brought under the FTCA is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Luna*, 454 F.3d at 634. In this case, the alleged negligence occurred in Illinois, so Illinois law governs.

In practice, that means Kulesza and Payton are subject to the same substantive legal standard. Under Illinois tort law, Lane-Murray must prove that (1) the defendants owed Murray a duty; (2) they breached that duty; and (3) their breach was a proximate cause of Murray's injuries. *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999); *Barnett v. Ludwig and Co.*, 960 N.E.2d 722, 730 (Ill. App. Ct. 2011); *Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013). Lane-Murray must prove each of these elements by a preponderance of the evidence. *Nolan v. Weil-McLain*, 910 N.E.2d 549, 562 (Ill. 2009); *Leonardi v. Loyola Univ. of Chi.*, 658 N.E.2d 450, 455 (Ill. 1995).

### A. Payton's Negligence

As noted earlier, the question of Payton's negligence is not seriously in dispute. All of the parties acknowledge that Payton should be held at least 50% liable for the accident (with the government arguing that Payton is 100% responsible). And given the factual findings against Payton—he was intoxicated, speeding, and ran a red light—the elements of negligence are squarely met with regard to Payton.

### B. Kulesza's Negligence

The key dispute is whether Kulesza was also negligent. Turning first to the question of duty, the government does not really dispute that there is a duty to drive safely and follow the speed limit. To sum up, here are the factual findings against

26

Kulesza: (1) he was driving a seven-ton truck; (2) he was driving above the speed limit at 36 miles per hour; (3) he knew that the intersection was obstructed by foliage; and (4) he was in the wrong lane. True, there is a dispute about what the speed limit actually was. As mentioned above, the government argues that Kulesza's speed limit was 30 miles per hour, while Lane-Murray and Payton argue that his speed limit was 25 miles per hour. In support of 30 miles per hour, the government points to the Illinois Vehicle Code, which says that the speed limit in an urban district is 30 miles per hour unless otherwise posted. 625 ILCS 5/11–601(c). And here, the government contends, there was no posted speed limit marker along westbound Congress between the point when Kulesza got off the I-290 exit ramp and the Independence Boulevard intersection. Thus, argues the government, Kulesza's speed limit was 30 miles per hour.

What makes this a tricky issue is that there *was* in fact a posted speed limit marker of 25 miles per hour on Congress. The problem, though, is that the sign was posted *east* of where the I-290 exit ramp merges onto westbound Congress. That means it would have been impossible for anyone merging onto westbound Congress from I-290 to see the sign. Hence this legal question: are drivers who are coming off I-290 to merge onto westbound Congress bound by the 25-mile-per-hour marker? Or put more broadly: are drivers who are coming off a highway exit ramp and merging onto a surface street bound by the speed limit on a sign posted on the street *before* the ramp?

27

It appears that there is zero case law on this point in Illinois. None of the parties identified any cases on this precise issue, nor could the Court find any. If the Court had to decide the issue, then the conclusion would probably be that drivers are bound by the posted speed limit. From a practical perspective, it would be absurd if drivers on that one block of westbound Congress were essentially bound by different speed limits depending on when they merged onto the street (as in, Kulesza coming off the I-290 exit ramp would be bound by the 30-mile-per-hour default limit, while a driver who had been driving locally on the same block would be bound by the 25-mile-per-hour sign). And requiring adherence to the posted surface-street limit would promote greater caution in the drivers exiting a highway.

In any event, as it turns out, it is not necessary to determine the exact speed limit along that stretch of Congress, because either way, at 36 miles per hour, Kulesza was both over the speed limit and going too fast for the conditions. Even if the limit was 30 miles per hour, at 36 miles per hour, he was driving 20% over the speed limit. Indeed, "regardless of what the applicable maximum speed limit is, drivers are still required to drive at a speed which is reasonable and proper for traffic conditions." *Watkins v. Schmitt*, 665 N.E.2d 1379, 1387 (Ill. 1996) (citing 625 ILCS 5/11–601). With seven tons of weight behind him, Kulesza should have known that any collision with his truck would cause much graver damage than an ordinary passenger vehicle. It was 3 a.m. (so artificial light was all there was) and foliage obstructed the view of the intersection. The Court concludes that Kulesza breached his duty to drive safely.

That still leaves the question of causation, though. Here, the government does not dispute that Kulesza was a "but-for" cause of the accident—if Kulesza had gotten to the intersection even a couple of seconds earlier or later, the accident likely would not have happened. What the government does dispute, though, is *proximate* cause. As a threshold matter, just because Payton was found to be liable does not mean Kulesza cannot also be liable. "It is a fundamental principle that there may be more than one proximate cause of an injury." *Espinoza v. Elgin, Joliet & E. Ry. Co.*, 649 N.E.2d 1323, 1328 (Ill. 1995). In determining whether Kulesza was also a proximate cause of the accident, "[t]he relevant inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Abrams v. City of Chicago*, 811 N.E.2d 670, 674-75 (Ill. 2004) (cleaned up). So, the focus here is whether Kulesza could have reasonably foreseen that his actions—driving a seven-ton truck over the speed limit at an obstructed-view intersection—were likely to result in a car accident.

The government argues no. According to the government, Illinois law does not require drivers to foresee the negligence of other drivers. *See* Gov't Br. at 2. But this cannot be correct. Simply having the green light does not absolutely insulate a driver from liability for his own negligence. Consider, for instance, if Kulesza had been driving at 100 m.p.h. with his eyes closed through the intersection. In that case, the fact that he had a green light would not be dispositive. But in essence, the government is asking the Court to adopt a less-extreme version of that hypothetical by letting

Kulesza completely off the hook as a matter of law simply because Payton was negligent.

More importantly, the caselaw does not support a blanket rule that one driver's negligence negates the negligence of a different driver for proximate-cause purposes. For one, none of the cases cited by the government are quite on point. *First Springfield Bank*, for instance, was about a no-parking sign violation. As the Illinois Supreme Court noted in that case, "[t]he question is whether it was reasonably foreseeable that violating a 'no parking' sign at mid-block would likely result in a pedestrian's ignoring a marked crosswalk at the corner, walking to mid-block, and attempting to cross a designated truck route blindly and in clear violation of the law." 720 N.E.2d at 1073. Indeed, the state supreme court distinguished the case from a different case in which a driver parked in the *middle* of a pedestrian crosswalk; there, the court explained, it *was* perfectly foreseeable that blocking a crosswalk could lead to a pedestrian accident. *Id.* (citing *Scerba v. City of Chicago*, 672 N.E.2d 312 (Ill. App. Ct. 1996)). In contrast, parking in a mid-block "no parking" zone did not increase "the likelihood that a pedestrian would forgo an open crosswalk in favor of an obstructed and unlawful mid-block crossing." *First Springfield Bank*, 720 N.E.2d at 1074. Another way to look at it is that the mid-block "no parking" sign in *First Springfield Bank* was not meant to deter pedestrian accidents. Here, by contrast, the speed regulations that Kulesza violated were meant precisely to guard against the possibility of a car accident.

Nor does *Daly v. Bant* establish an absolute rule that one driver's negligence is, as a matter of law, unforeseeable to another negligent driver. *Daly v. Bant*, 258 N.E.2d 382, 385 (Ill. App. Ct. 1970). That case involved a two-car collision in which the defendant was speeding but the plaintiff also ran a stop sign. It is true that the Illinois Appellate Court held that proximate cause had not been satisfied, but the court's reasoning was that the plaintiff had failed to prove, as an evidentiary matter, that the defendant was in fact speeding. *Daly*, 258 N.E.2d at 385. So that case does not govern.[13] The same goes for *Marsh v. McNeill*, in which the Illinois Appellate Court held that "the sole cause of the collision was the fact that [the plaintiff] drove her car directly into the path of [the defendant's] truck under circumstances that afforded him no opportunity to avoid the collision." 483 N.E.2d 595, 598 (Ill. App. Ct. 1985). Specifically, the plaintiff in *Marsh* alleged that the defendant breached a duty to sound his horn and apply his brakes to avoid the accident, which the court rejected. *Id*. Here, by contrast, the allegation is not that Kulesza failed to swerve or sound his horn or take any affirmative precautionary measure; rather, the allegation is that Kulesza himself was driving at an unreasonable speed.

---

[13]At trial, the government acknowledged the evidentiary shortcoming but noted that, nonetheless, the *Daly* court explained that even if the defendant truly had been speeding, there would still be no proximate cause. That does not accurately describe the holding. Rather, the court mentioned that even if the defendant had been speeding, that would not constitute *negligence per se*—but the court left open whether the elements of negligence could have otherwise been met. *Daly*, 258 N.E.2d at 385 ("The mere failure to perform a statutory duty does not necessarily constitute negligence; a party may be negligent if the circumstances under which he, she, or it fails to observe the statute indicate a neglect of duty; but the mere failure, alone, to comply with the statute, may not be negligence.").

Similarly, none of the other cases cited in the government's brief are quite analogous to the facts of this case. *Abrams* and *Thompson* both involved municipal defendants, as opposed to a driver involved in a two-vehicle collision. *Abrams v. City of Chicago*, 811 N.E.2d 670 (Ill. 2004) (holding that the *city*, as opposed to another driver on the road, could not have foreseen that the failure to send an ambulance to plaintiff would cause plaintiff to drive herself, run a red light, and hit a drunk driver); *Thompson v. County of Cook*, 609 N.E.2d 290 (Ill. 1993) (holding that *county's* failure to maintain a road sign was not proximate cause of car accident where plaintiff was hit by driver who was speeding, drunk, and evading police). In *Osborne*, the Illinois court held that it was not negligent for a driver to swerve to respond to a "sudden emergency" where the driver had been careful up to that point. *Osborne v. Redell*, 159 N.E.2d 841 (Ill. App. Ct. 1959). And in *Nelson*, the question was whether police officers should be liable for instigating a police chase of a suspect who then ran a red light and collided with another car; that is not the same thing as two drivers colliding into each other. *Nelson v. Thomas*, 668 N.E.2d 1109, 1116 (Ill. App. Ct. 1996) (holding that police chase was simply "occasion" which provided opportunity for defendant to independently cause accident). In sum, none of the government's cited cases establish a *per se* rule that a driver is not required to foresee other negligent drivers.

The proximate-cause requirement ultimately exists to protect defendants from tort liability for "tragically bizarre" injuries. *Cunis v. Brennan*, 308 N.E.2d 617, 620 (Ill. 1974). Here, Murray's injuries were not "tragically bizarre." The prevention of car accidents is precisely the reason why safe-driving principles exist, including speed

32

limits and traffic lights. So it is foreseeable that driving over the speed limit can increase the likelihood of a car accident. What's more, Kulesza was not driving a normal passenger car; rather, he was driving a seven-ton box truck on a route that he knew was obstructed and susceptible to collisions.

Just one final note on the factual issue of Kulesza being in the wrong lane at the time of the accident. Ultimately, the Court does not find that fact persuasive in either the duty or the proximate-cause analyses. Yes, Kulesza violated the lane markings by being in the left-turn-only lane instead of the through-lane. But it is difficult to see how being in the wrong lane at this particular intersection contributed to the collision from a proximate cause perspective. It would be one thing, for instance, if the traffic lanes had any impact on visibility, but there is no evidence that Kulesza would have been able to see Payton's car had he been in the center lane instead of the left-turn-only lane. And even if Kulesza had been planning to turn left, he would have still needed to cross the northbound Independence intersection, which would have still been obstructed, meaning he would have still collided with Payton's car. From a but-for cause perspective, it is true that maybe the collision would have happened a different way, or perhaps not at all, if Kulesza had simply been in the center lane. But neither Lane-Murray nor Payton offered evidence that the accident would have happened differently. And, in any event, whether the accident would have happened in a different way does not really speak to the proximate-cause inquiry of whether it was *foreseeable* to Kulesza that being in the left-turn lane instead of the center lane was likely to result in a collision with a car coming up northbound

33

Independence. For those reasons, the Court is not relying on Kulesza's wrong-lane driving in determining that Kulesza proximately caused the accident. Rather, the finding of proximate cause is based on the fact that Kulesza was driving too fast for the circumstances, which included the legal speed limit (whether it be 25 or 30 miles per hour), the size and weight of his truck, the artificial-light-only lighting, and the obstructed view at the intersection.

## C. Apportionment of Liability

That being said, even though both drivers were negligent, Kulesza's part in the accident was extremely small relative to Payton's negligence. Specifically, the Court finds that Payton was 95% at fault, while Kulesza was only 5% at fault.

For one, it obviously matters a great deal that Kulesza had the green light. It is true that, as explained above, the green light does not completely exonerate Kulesza from any wrongdoing—after all, he was driving faster than was reasonable under the circumstances. But that is still vastly outweighed by the fact that Payton was intoxicated and ran the red light. And even if Payton had been fully in control of his car, he was still driving more than 20 miles per hour above his speed limit. If that sounds like a lot for a 30 miles-per-hour zone, it is even more starkly visible in the POD video footage, which shows Payton's car entering the intersection at a startlingly faster speed than any of the other cars on the road that night. So, even though Kulesza was speeding, there was very, very little time for Kulesza to slow down once Payton's car became visible. Under those circumstances, Payton's negligence far

outweighs Kulesza's. The 95%-5% apportionment of liability reflects the relative blameworthiness of the defendants.

### III. Damages

Under Illinois law, "all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault … shall be severally liable for all other damages." 735 ILCS 2-1117. In practical terms, what this means is that Payton and the government would have been jointly and severally liable for Murray's medical expenses, but Murray seeks no medical damages. Instead, because Kulesza's fault was determined to be only 5%, which is under the 25% threshold, the government will only be severally liable for all non-medical damages. In other words, the government will be responsible for only 5% of all non-medical damages. Payton remains responsible for the entire amount (because he obviously exceeds the 25% threshold), though collection from him, as a practical matter, no doubt will be difficult.

Lane-Murray seeks damages under the Illinois Wrongful Death Act, 740 ILCS 180/1.[14] "A wrongful-death action covers the time after death and addresses the injury suffered by the next of kin due to the loss of the deceased rather than the injuries personally suffered by the deceased prior to death." *Wyness v. Armstrong World Indus., Inc.*, 546 N.E.2d 568, 571 (Ill. 1989). Specifically, it is meant to provide the family with "the benefits that would have been received from the continued life of the

---

[14]Lane-Murray also alleged claims under the Illinois Survival Act, 755 ILCS 5/27-6, but those claims were all dismissed at the pretrial stage. R. 110 at 1.

decedent." *Elliott v. Willis*, 442 N.E.2d 163, 168 (Ill. 1982). Here, Lane-Murray seeks $8,000,000 in damages for loss of consortium, loss of society, loss of emotional support, grief and suffering, and loss of financial support, as well as $11,759.09 in funeral expenses. Lane-Murray does not seek any medical expenses. Because this was a bench trial, it is up to the Court to determine the amount of damages that will be "a fair and just compensation with reference to the pecuniary injuries resulting from [Murray's] death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." 740 ILCS 180/2(a). The Court also decides how to apportion the damages among Murray's surviving family members. 740 ILCS 180/2(b).

Based on the testimony offered at trial, the total compensatory damages award for Murray's wife and three children, K.M., A.M., and S.M., is $1,750,000. Sydni Murray was relatively young when he passed (just 31 years old), and he had at least 40 years more years of life expectancy (Stipulations 10 and 11). Lane-Murray testified convincingly about the importance of Sydni's companionship as a spouse and as a father to S.M., who was six years old at the time of trial. Lane-Murray credibly described how Sydni used to spend time with S.M., singing to her and doing all sorts of activities with her. After the accident, S.M. would frequently ask Lane-Murray when Sydni was coming home and why he couldn't take her to school or help her with her homework. As for Lane-Murray herself, she explained how she closed herself off to relationships for years after the accident and still feels attached to Sydni. She

emphasized how difficult it was for her to raise S.M. by herself, particularly because S.M. still asks about Sydni.

In addition to Lane-Murray's testimony, Kandace Abernathy also testified convincingly about Sydni's important role in their son K.M.'s life. K.M. was 14 years old at the time of trial, and according to Abernathy, K.M. and Sydni were best friends. Abernathy explained how Sydni was an important role model for K.M., and that since the accident, K.M. has become noticeably more reserved and has started seeing a counselor at school. Unfortunately, A.M's mother, Richara Jackson, did not testify at trial, so the Court was unable to hear direct testimony on Sydni's relationship with his daughter A.M. In addition, the testimony on Sydni's very spotty employment record was much too vague to permit any inference to be drawn on his financial contributions for purposes of lost wages.

On apportionment, it is normally crass to compare the strength of familial connections. But court decisions must be based on *evidence*, and here, the testimony showed that Murray's connection with Lashawna and K.M. was tighter than with S.M., who in turn had more connection than A.M. So, the allocations are:

| | |
|---|---|
| Lashawna: | $550,000 |
| KM.: | $550,000 |
| S.M. | $400,000 |
| A.M.: | $250,000 |

Finally, the estate is also entitled to $11,759.09 in funeral expenses (Stipulation 9). So, the total damages award is $1,761,759.09.

As mentioned above, under 735 ILCS 2-1117, because these are all non-medical damages, Payton will be liable for the entire award of damages, while the government will be on the hook for 5% ($88,087.95). The status hearing of July 17, 2020 is vacated, and the Court will enter final judgment.

ENTERED:


     s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 8, 2020